UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

KONINKLIJKE PHILIPS N.V.,                      :

               Plaintiff,          :

           -against-                      :

IGUZZINI LIGHTING USA, LTD., *et al.*,   :

                        :

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

15cv3979

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Koninklijke Philips N.V. ("Philips") and Defendants iGuzzini Lighting

USA, Ltd., iGuzzini Lighting North America, Inc., and iGuzzini Illuminazione S.P.A.

("iGuzzini") raise two issues regarding a proposed protective order: (1) whether Philips' in-

house attorneys should have access to "attorneys' eyes only" material; and (2) whether a patent

prosecution bar should cover claim amendments in certain post-grant proceedings before the

Patent & Trademark Office.  For the reasons that follow, Philips' proposal for in-house counsel

access to "attorneys' eyes only" material is granted in part and iGuzzini's proposal to bar

litigation attorneys from participating in the claim amendment process is denied.

## BACKGROUND

        Philips seeks a declaratory judgment that iGuzzini infringes five of its patents for

light emitting diodes ("LEDs").  (See ECF No. 1, at 3–6.)  iGuzzini counterclaims for a

declaratory judgment that the patents-in-suit are invalid.  (ECF No. 18, at 8–11.)

DISCUSSION

I.     "Attorneys' Eyes Only" Material

        The Federal Rules of Civil Procedure provide qualified protection for "trade

secret[s] or other confidential research, development, or commercial information." Fed. R. Civ.

P. 26(c)(1)(G).  In patent cases, district courts generally apply "regional circuit law when the

issue involves an interpretation of the Federal Rules of Civil Procedure." Manildra Milling

Corp. v. Ogilvie Mills, Inc., 76 F.3d 1178, 1182 (Fed. Cir. 1996).  But the determination of

whether a lawyer "should be denied access to information under a protective order" in a patent

case is an "issue unique to patent law" governed by Federal Circuit precedent.  In re Deutsche

Bank Trust Co. Americas, 605 F.3d 1373, 1377 (Fed. Cir. 2010).  And the seminal Federal

Circuit authority on protective orders is U.S. Steel Corp. v. United States, 730 F.2d 1465 (Fed.

Cir. 1984).  See Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co., No. 5:03-cv-165, 2003 WL

1956214, at *4 (N.D.N.Y. Apr. 24, 2003).

        Philips proffers five in-house counsel from its Intellectual Property & Standards

("IP&S") group for access to attorneys' eyes only documents.  Each is a member of Philips'

"LED Licensing Program," an initiative that seeks to identify alleged infringement of Philips'

intellectual property, reverse-engineer potentially infringing products, negotiate licenses, obtain

fees, and pursue enforcement actions.  (See, e.g., ECF No. 32-1, at 4.)


    A.  Competitive Decisionmaking

        The question of an in-house attorney's access to confidential information must be

resolved "on a counsel-by-counsel basis" by assessing "each individual counsel's actual activity

2

and relationship with the party represented, without regard to whether a particular counsel is in-house or retained." U.S. Steel, 730 F.2d at 1468–69. "[T]his determination should turn on the extent to which counsel is involved in 'competitive decision making' with [the] client." Xerox Corp. v. Google, Inc., 270 F.R.D. 182, 183 (D. Del. 2010). "Competitive decisionmaking" is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." U.S. Steel, 730 F.2d at 1468 n.3. The rationale undergirding U.S. Steel is "no reflection on the unquestioned integrity and unblemished record" of in-house counsel. See U.S. Steel, 730 F.2d at 1467. Rather, the "competitive decisionmaker" analysis hinges on the risk of inadvertent disclosure, because it is difficult "for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." Deutsche Bank, 605 F.3d at 1378.

Because counsel's role in a corporation varies, an individualized assessment of each attorney's responsibilities is necessary. Compare ActiveVideo Networks, Inc. v. Verizon Comm'cns, Inc., 274 F.R.D. 576, 581–84 (E.D. Va. 2010) (counsel not competitive decisionmakers absent substantial engagement with patent prosecution and licensing), and Barnes and Noble, Inc. v. LSI Corp., No. 11-02709, 2012 WL 601806, at *3 (N.D. Cal. Feb. 23, 2012) (counsel not competitive decisionmakers because "B & N is not in the business of licensing patents and has no patent licensing department"), with Norbrook Labs., 2003 WL 1956214, at *5 (counsel who was a member of company's board of directors was competitive decisionmaker), ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, No. 6:07-cv-346,

2008 WL 5634214, at *5 (E.D. Tex. Mar. 14, 2008) (counsel who "monetize[d] patents" and was "extremely involved in the licensing of . . . patents" was competitive decisionmaker), and Intel Corp. v. VIA Tech., Inc., 198 F.R.D. 525, 530 (N.D. Cal. 2000) (counsel "actively involved in negotiating the terms of licensing agreements" was competitive decisionmaker). The degree to which in-house counsel is involved in patent prosecution or commercial licensing identifies attorneys likely to benefit the client by using the opposing party's confidential information or trade secrets. But the analysis is not a "one-dimensional endeavor," and must be examined attorney by attorney. Deutsche Bank, 605 F.3d at 1380.

       Philips proposes access to "attorneys' eyes only" documents for five counsel with varying experience and responsibilities. Daniel P. Gaudet is at the apex of Philips' nominees. He is an IP&S Senior Director who has been the lead negotiator for more than 80 LED licensing agreements, and is "responsible for mentoring" the eight other U.S.-based attorneys in the licensing program. (ECF No. 32-10, at 2–3.) John W. Pint, an IP&S Senior Intellectual Property Counsel, has served as lead negotiator for 48 LED licensing agreements, anticipates serving as the "primary liaison" between Philips' outside counsel and the in-house litigation team, and anticipates negotiating the terms of any settlement in this case. (ECF No. 32-1, at 12.) Jonathan W. Andron, an IP&S Senior Intellectual Property Counsel, has served as the lead negotiator for 7 LED licensing agreements, anticipates preparing and reviewing briefs, and anticipates assisting Philips' outside counsel in responding to discovery and ensuring the consistency of Philips' legal positions with positions taken in other matters. (ECF No. 32-11, at 1–2.) Stephen M. Kohen, an IP&S Senior Intellectual Property Counsel who served as lead negotiator for 3 LED licensing agreements, anticipates providing "technical assistance" with reverse-engineering iGuzzini

products, assisting with claim construction, reviewing technical documentation, and ensuring the consistency of Philips' legal positions with corresponding litigation in Europe. (ECF No. 32-8, at 2.) Kellan Ponikiewicz, an IP&S Intellectual Property Counsel who served as lead negotiator for 1 LED licensing agreement, anticipates preparing and reviewing infringement and invalidity contentions and claim construction briefs, analyzing schematics and data sheets for relevant products, reviewing and analyzing prior art, and ensuring the consistency of Philips' legal positions with positions taken in other U.S. litigation. (ECF No. 32-9, at 2.)

Philips concedes that the IP&S attorneys involved in its litigation efforts "negotiate licensing agreements with third parties, and participate in [patent] enforcement actions as necessary," but contends that the IP&S division is an "independent organization" that is "not involved in the pricing or product development aspects of an operating business." (See ECF No. 32, at 4–5.) To the contrary, Philips' own website asserts that IP&S is a profit-making enterprise. IP&S is "run as a business" and independently produces "substantial revenue" for Philips. (See ECF Nos. 38-2, 38-3, 38-4.) Inherent in their duties, Philips' IP&S attorneys gather information used to pursue a competitor or customer for a license, such as "identifying potential licensees . . . negotiating and consummating license agreement contracts." (See, e.g., ECF No. 32-1, at 1.) In short, by virtue of their participation in Philips' LED Licensing Program, the attorneys proffered from the IP&S department pose some risk of competitive decisionmaking.

B.  <u>Balancing Test</u>

However, "[a] determination of the risk of inadvertent disclosure or competitive use does not end the inquiry.  Even if a district court is satisfied that such a risk exists, the district court must balance this risk against the potential harm to the opposing party."  <u>Deutsche Bank</u>, 605 F.3d at 1380 (citing <u>U.S. Steel</u>, 730 F.2d at 1468).  When balancing iGuzzini's interest against disclosure with the resultant harms to Philips, "the district court has broad discretion to decide what degree of protection is required."  <u>Deutsche Bank</u>, 605 F.3d at 1380 (citation omitted).  The balance between the risk of inadvertent harm to iGuzzini and the risk of disrupting Philips' litigation efforts turns on the individual roles played by its in-house attorneys.

By his own admission, Daniel P. Gaudet, an IP&S Senior Director, is a "key architect of the Philips LED Licensing Program."  (See ECF No. 32-10, at 2.)  Here, Gaudet does not appear to have any particularized need to read the "attorneys' eyes only" materials involved in this litigation. Rather, Gaudet's role, according to Philips, is oversight of "all US-based litigations," "directing litigation strategy," and "coordinati[ng]" with outside counsel.  Gaudet's decisionmaking role within Philips fails to provide an adequate rationale for access.

Jonathan W. Andron, an IP&S Senior Intellectual Property Counsel working on the LED Licensing Program, has also acted as lead negotiator in a number of patent licensing matters. (<u>See</u> ECF No. 32-11, at 2.)  Here, Andron's proffered role is to "prepar[e] and review[] legal briefs," "assist[] in responding to discovery," and ensure the "consistency" of Philips' legal positions.  (<u>See</u> ECF No. 32-11, at 2.)  These tasks do not appear to require access to iGuzzini's "attorneys' eyes only" material.  To the extent that reviewing such documents is necessary for

brief writing or discovery disputes, Philips' outside counsel can perform that role together with those in-house attorneys authorized to have access to "attorneys' eyes only" materials.

Each of the three remaining IP&S attorneys also participates in Philips' LED Licensing Program. (See ECF Nos. 32-1, at 8; 32-8, at 2; 32-9, at 2.) But Philips has made a strong showing of need for each of these attorneys, who are the "most actively involved in this case on a daily basis." (See ECF No. 32, at 12.) John W. Pint is the "primary liaison" between outside counsel and Philips' in-house litigation team, and may negotiate the terms of a settlement on the basis of materials disclosed in discovery. (ECF No. 32, at 12; ECF No. 32-1, at 12.) Stephen M. Kohen intends to perform a "technical analysis of iGuzzini's confidential circuit schematics," some of which will likely be designated "attorneys' eyes only." (ECF No. 32-8, at 4.) And Kellan Ponikiewicz is the "primary lead for the technical aspects of this case, including preparing and reviewing infringement and invalidity contentions, analyzing schematics and data sheets for relevant products, and analyzing prior art." (ECF No. 32, at 9.) Each attorney fulfills a role essential to Philips' overall litigation strategy. Philips' interest in utilizing these three attorneys outweighs iGuzzini's nonspecific objections that confidential information could be used against it.

II.    Patent Prosecution Bar

Next, the Court turns to the parties' dispute regarding a patent prosecution bar. The parties' proposed bar precludes any person with access to "attorneys' eyes only" materials from prosecuting patent applications relating to LED-based lighting for general illumination before the U.S. Patent & Trademark Office ("USPTO") or any foreign patent office for one year.

The agreement exempts, however, "participation in reexamination proceedings, inter partes review proceedings, covered business method review proceedings, or post-grant review proceedings" from the terms of the bar. (See ECF No. 16-2, at 18.) But iGuzzini wishes to introduce a further restriction—that those with access to "attorneys' eyes only" documents shall not be permitted to participate in claim amendments by adding or revising claims in such proceedings.

As with the analysis of in-house counsel, the Court must first determine on an attorney-by-attorney basis whether individuals who receive confidential information play a role in "competitive decisionmaking." Deutsche Bank, 605 F.3d at 1378. Second, the court weighs the risk of inadvertent disclosure against the potential harm caused by placing restrictions on access to counsel. Deutsche Bank, 605 F.3d at 1378. The parties agree on the scope of the patent prosecution bar to be imposed on post-grant proceedings, with the single exception of the claim amendments provision. iGuzzini bears the burden of demonstrating that it would be harmed by giving access to its "attorneys' eyes only" materials to Philips counsel. See Deutsche Bank, 605 F.3d at 1378 ("A party seeking a protective order carries the burden of showing good cause for its issuance. The same is true for a party seeking to include in a protective order a provision effecting a patent prosecution bar.").

### A.  Competitive Decisionmaking

First, this Court must assess whether an attorney participating in claim amendments is a "competitive decisionmaker." In Deutsche Bank, the Federal Circuit distinguished attorneys who are not competitive decisionmakers because their duties "involve

little more than reporting office actions or filing ancillary paperwork" or whose duties merely require involvement in "high-altitude oversight of patent prosecution" from attorneys for whom competitive decisionmaking is a "regular part of their representation" because they are "substantially engaged with prosecution," or are "strategically amending or surrendering claim scope during prosecution." Deutsche Bank, 605 F.3d at 1380. Indeed, Philips' counsel is currently involved in two inter partes review ("IPR") proceedings filed by a third party ("Wangs Alliance Corp.") regarding patents involved in this case. (See ECF No. 31, at 7.) To the extent Philips' counsel is participating or will participate in post-grant proceedings before the PTO involving the patents-in-suit, their ability to adjust the scope of Philips' patent claims using a competitor's "attorneys' eyes only" materials from this litigation could qualify them as competitive decisionmakers.

      iGuzzini's argument is that once Philips gains access to its confidential information, it should not receive "the unfair and improper advantage of also crafting the language of the narrowed claims" in parallel post-grant proceedings. (See ECF No. 16-2, at 26.) The parties report, however, that iGuzzini is not currently involved in the post-grant proceedings against Philips, and has not explained how the use of its confidential information would cause harm. See, e.g., PPC BroadBand, Inc. v. Times Fiber Commc'ns, Inc., No. 5:13-cv-0460, 2014 WL 859111, at *3 (N.D.N.Y. Mar. 5, 2014) ("It is not enough to identify a general risk that confidential information disclosed during litigation may influence counsel's representation of a party before the PTO."); Helferich Patent Licensing, LLC v. Suns Legacy Partners LLC, Nos. 11-cv-02304 et al., 2012 WL 6049746, at *3 (D. Ariz. 2012) (rejecting prosecution bar where confidential information alleged was "vague and speculative," and "d[id] not identify any

specific information that would cause injury"); Paice, LLC v. Hyundai Motor Co., No. WDQ-12-04999, 2014 WL 4955384, at *4 (D. Md. Sept. 29, 2014) (rejecting proposed bar where movant made only "general assertions" and proffered "no specific facts" indicating how the party's confidential information would be used).  Indeed, iGuzzini's suggestions that any confidential information would be misused are not persuasive, as "amendments made during reexamination can only serve to narrow the original claims.  Hence, no product that did not infringe a patent before reexamination could ever infringe that patent following [post-grant proceedings].").  Xerox Corp., 270 F.R.D. at 185; see also Pall Corp. v. Entegris, Inc., 655 F. Supp. 2d 169, 173 (E.D.N.Y. 2008) ("[U]nlike prosecution of an initial patent application, the Patent Act expressly curtails the scope of reexamination, prohibiting any claim amendment that would enlarge the scope of the initial patent").

   While several decisions suggest that a patent owner might be able to use confidential information to strategically narrow the claim through amendments, or style claim amendments as "narrowing" when they in fact broaden the patent owner's claim, each of those rulings was announced in the context of sparring over the Northern District of California's default protective order for patent litigation.  See, e.g., Grobler v. Apple, Inc., No. C 12-01534, 2013 WL 3359274, at *1 (N.D. Cal. May 7, 2013) ("[T]his district is authorized under Fed. R. Civ. P. 83 to establish [a presumptive prosecution bar] that extends to reexamination or review proceedings, an authority exercised by the combination of Section 6 of the district's Model Protective Order and Pat. L.R. 2–2."); see also Telebuyer, LLC v. Amazon.com, Inc., No. 13-cv-1677, 2014 WL 5804334, at *6 (W.D. Wa. July 7, 2014) (collecting Northern District of California cases).  Additionally, four of the five decisions cited by iGuzzini involved software

design patents, and in those decisions disclosure of the parties' highly confidential information, such as source code, would have compromised the value of their products. See, e.g., Evolutionary Intelligence, LLC v. Foursquare Labs, No. C 13-04203, 2014 WL 1311970, at *3– 4 (N.D. Cal. Mar. 29, 2014) (design documents for implementing popular social networking application Foursquare); Software Rights Archive, LLC v. Facebook, Inc., Nos. 5:12-cv-03970 et al., 2014 WL 116366, at *3–4 (N.D. Cal. Jan. 13, 2014) (search index mechanisms of Facebook, Twitter, and Linkedin); Grobler, 2013 WL 3359274, at *1–2 (Apple's iTunes); EPL Holdings, LLC v. Apple, Inc., No. 12-cv-04306, 2013 WL 2181584 (N.D. Cal. May 20, 2013) (source code in suit involving iPhone, iPod, iPad, and other Apple products). By contrast, iGuzzini has failed to show that it has highly confidential information, not yet disclosed to Philips, which could harm it in post-grant proceedings, where it is not even a participant.

B. Balancing Test

Even if iGuzzini had shown that there was a serious risk of inadvertent disclosure such that Philips' outside counsel were "competitive decisionmakers," this Court must still weigh the harm to Philips by cabining access to counsel of its choice. Deutsche Bank, 605 F.3d at 1378. Courts "consider such things as the extent and duration of counsel's past history in representing the client before the PTO, the degree of the client's reliance and dependence on that past history, and the potential difficulty the client might face if forced to rely on other counsel for the pending litigation or engage other counsel to represent it before the PTO." Deutsche Bank, 605 F.3d at 1381. The close and longstanding relationship between Philips and its attorneys raises the specter that iGuzzini is attempting to disrupt Philips' choice of counsel. See Mirror

Worlds, LLC v. Apple, Inc., No. 08-cv-88, 2009 WL 2461808, at *2 (E.D. Tex. Aug. 11, 2009) (evincing concern that defendants might use the combination of reexamination proceedings and a protective order to force plaintiffs to "defend a patent in two separate venues with two teams of attorneys"). Since defendants have already consented to a very narrow exclusion that prevents Philips' attorneys with access to "attorneys' eyes only" material from "making the decision" on amending the claims, but not from arguing "the substance of those amendments in front of the PTAB" or being "involved in the depositions of experts," it is hard to see what iGuzzini's proposal would accomplish beyond frustrating Philips' unified litigation efforts. (See ECF No. 38, at 24.) It would also cultivate another ground for litigation later.

"[D]enying access to [a party's] outside counsel on the ground that they also prosecute patents for [that party] is the type of generalization counseled against in U.S. Steel." Deutsche Bank, 605 F.3d at 1379 (citation omitted). Counsel has a "strong interest in choosing its own counsel—particularly in the complex and technical realm of patent litigation." Xerox Corp., 270 F.R.D. at 185. Here, Denise DeFranco and C. Brandon Rash of Finnegan Henderson "have long been Philips' chosen counsel both at the PTO and in the district courts." (ECF No. 31.) DeFranco and Rash have represented Philips in nine IPRs, seven of which are ongoing. (ECF No. 31, at 11–12.) Each IPR has related to ongoing patent litigation, and in each proceeding, both attorneys were permitted simultaneously to see "attorneys' eyes only" materials and participate fully in IPR proceedings. (See ECF No. 31, at 6–7.) The parties' proposed protective order prohibits counsel from using these "attorneys' eyes only" materials for any purpose other than this litigation, and Philips' attorneys are duty-bound to adhere to this clause— and their ethical obligations—in any related patent proceeding. So too, the same strictures apply

12

to those in-house counsel who are granted access to "attorneys' eyes only" material.
Accordingly, iGuzzini has failed to sustain its burden.


CONCLUSION

This Court grants Philips' application for in-house attorney access to "attorneys' eyes only" material in part and denies iGuzzini's application to extend a patent prosecution bar to claim amendments in post-grant proceedings. The parties are directed to resubmit a proposed protective order consistent with these rulings by October 1, 2015.


Dated: September 22, 2015
       New York, New York

                                          SO ORDERED:


                                          _____  9/22/15
                                          WILLIAM H. PAULEY III
                                          U.S.D.J.


*Copy via ECF to:*

*All Counsel of Record.*